THE PEOPLE, &c.; *ex rel.* ROBERT L. KENNEDY and others, Appellants, *v.* THE COMMISSIONERS OF TAXES, &c., Respondents; and ten other cases.

The stockholders of a national or State bank, where its capital is invested in the bonds or securities of the United States, may be assessed and taxed, under State law, for the value of their respective shares of the capital of said bank; but the bonds and securities of the United States, whether owned by individuals or corporations, are not liable to be thus assessed and taxed.

Such shares in the capital stock of a bank, which capital is invested in United States bonds or other securities, are subject to assessment and taxation, under the authority of State laws, at the place where such bank is located, and not elsewhere.

The tax imposed by State laws must not be at a greater rate than upon other moneyed capital in the hands of individual citizens of the State where made; nor must such tax exceed the rate imposed upon the shares of any of the banks organized under the authority of the State where such association is located.

THESE are appeals from judgments of the Supreme Court of the first judicial district. The relators brought into that court, for review, by writ of certiorari, the determination of the respondents, as commissioners of taxes in and for the city and county of New York, whereby the relators had been assessed for taxes upon their personal estate as shareholders in national and State banks. The Supreme Court affirmed the assessments, and the relators now appeal to this court.

*B. D. Silliman, J. E. Burrill, E. S. Van Winkle, William M. Evarts,* for the appellants.

*R. O'Gorman, Waldo Hutchins, Charles O'Conor,* for the respondents.

DAVIES, Ch. J. The questions presented for adjudication in all of the above entitled actions are identical, except that in those marked 2, 3, 4, 5, 6, 9 and 10, points have been argued peculiar to those cases, and not arising in the others. These differences will be hereafter adverted to.

The relators in these actions have been assessed by the respondents. the tax commissioners of the city of New York,

for personal estate, on the estimated value of their respective shares of the capital stock of several national banks in the records mentioned, located and doing business in the city of New York, except the relators, David Dows and Ralph Mead, who are assessed for the value of their shares of the capital of the Corn Exchange Bank, a banking corporation created by the laws of the State of New York, and also located and doing business in said city.

All the relators claim that they are illegally assessed in respect to said shares of stock, on the ground that the capital of said banks, respectively, is, wholly or in part, invested in the stocks or public debt of the United States. Where the whole capital of said banks is invested in said stocks or public debt, the relators claim to have their assessments respectively struck from the assessment roll; and where a part only of said capital is thus invested, they claim to have the taxable value of their shares proportionably reduced. The precise grounds for exemption, now urged upon this court, were presented for its consideration in the case of *The City of Utica* v. *Churchill* (33 N. Y., 161). We there held that the stockholders in the national banks, organized under the act of June 3, 1864, were subject to taxation, under State authority, upon the value of their shares, and that such taxation was expressly authorized by the 41st section of that act. Our opinion on that point we understand to have been approved by a decided majority of the judges of the Supreme Court of the United States, when the case was before that tribunal for review. (3 Wall., 573, there cited as *Van Allen* v. *The Assessors*.)

Our judgment in that case was, indeed, reversed; but the reversal was solely on the ground, that the enabling act of this State, passed March 9, 1865, did not conform to and contain the limitation embraced in one of the provisos to the 41st section of the act of congress. That proviso is in these words: "Provided, further, that the tax so imposed, under the laws of any State, upon the shares of associations authorized by this act, shall not exceed the rate imposed upon

the shares of any of the banks organized under the authority of the State where such association is located."

At the time of making the assessment in the case of *The City of Utica* v. *Churchill* (*ubi supra*), the banks of the State of New York, organized under the laws of that State, were subject to taxation upon their capital, and they were to be taxed " on the full amount of actual capital paid in, or secured to be paid in, as such capital, by them severally." (Laws of 1847, vol. 2, chap. 419, p. 521, § 4.)

The Supreme Court of the United States, as already observed, reversed the judgment of this court, on the ground that the enabling act of this State, of March 9, 1865, did not contain the limitation required by the act of congress. That court, in its opinion, said : " The banks of the State are taxed upon their capital ; and although the act provides that the tax on the shares of the national banks shall not exceed the par value, yet, inasmuch as the capital of the State banks may consist of the bonds of the United States, which are exempt from State taxation, it is easy to see that this tax on the capital is not an equivalent for a tax on the shares of the stockholders." The opinion of the court adds, very significantly : " This is an unimportant question, however, as the defect may be readily remedied by the State legislature." We are of the opinion that this difficulty has been removed by the act of the legislature of this State, passed April 23, 1866, and which became a law before the assessments now under consideration were made. (Laws of 1866, chap. 761, vol. 2, p. 1647.) That act declares that " no tax shall hereafter be assessed upon the capital of any bank or banking association organized under the authority of this State, or of the United States, but the stockholders in such banks and banking associations shall be assessed and taxed on the value of their shares of stock. Said shares shall be included in the valuation of the personal property of such stockholders in the assessment of taxes at the place, town or ward where such bank or banking association is located, and not elsewhere, whether the said stockholders reside in said place, town or ward, or not, but not at a greater rate than is assessed

upon other moneyed capital in the hands of individuals in this State. And in making such assessment, there shall also be deducted from the value of such shares such sum as is in the same proportion to such value as is in the assessed value of the real estate of the bank or banking association, and in which any portion of their capital is invested in which said shares are held, to the whole amount of the capital stock of said bank or banking association; and provided, further, that nothing herein contained shall be held or construed to exempt from taxation the real estate held or owned by any such bank or banking association, but the same shall be subject to State, county, municipal or other taxation, to the same extent and rate, and in the same manner, as other real estate is taxed."

In *The City of Utica* v. *Churchill* (*ubi supra*), the whole capital of the bank, the shareholders in which had been assessed and taxed, consisted in stocks and bonds issued by the United States under various acts of congress; and it was insisted that the shares of the bank held by the plaintiffs in that case as stockholders were not subject to assessment and taxation under State authority. This court and the Supreme Court of the United States, approving our judgment on this point, held that such stockholders might be assessed and taxed under the State law for the value of their respective shares of the capital of said bank, even although the whole capital thereof was invested in the bonds or securities of the United States. It had been settled, by previous adjudications of the Supreme Court of the United States, that such bonds or securities, whether owned by individuals or banks, or other corporations, were not liable to be assessed and taxed by State authority, and that, if any portion of the capital of a bank was thus invested, such part was exempt from any tax imposed by State authority on the capital or property of the bank. (*The Bank of Commerce* v. *New York City*, 2 Black, 620; *The Bank Tax Case*, 2 Wall., 200.) It follows, from the judgment of this court, and the opinion of the appellate court, that the stockholders are not entitled to any deduction on account of the whole or any portion of the capital of the

bank being invested in bonds or securities of the United States.

The results reached by the Supreme Court, in its opinion, are thus succinctly stated: " Now, in view of these several provisions, in which the terms, ' share' and ' shareholders,' are mentioned, and the clear and obvious meaning of the term, in the connection in which it is found — namely, the whole of the interest in the shares and of the shareholders — when the statute provides that nothing in this act shall be construed to prevent *all the shares* in any of the said associations, &c., from being included in the valuation of the personal property of any person or corporation in the assessment of taxes imposed by State authority, &c., can there be a doubt but that the term ' shares,' as used in this connection, means the same interest as when used in the other portions of the act? Take, for examples, the use of the term in the certificate of the number of shares in the articles of association; in the division of the capital stock into shares of one hundred dollars each; in the personal liability clause which subjects the shareholders to an amount, and, in addition, to the amount invested in such shares; in the election of directors, and in deciding all questions at meetings of stockholders, each share is entitled to one vote; in regulations for the payments of the shares subscribed; and, finally, in the list of shares kept for the inspection of the State assessors. In all these instances it is manifest that the term, as used, means the entire interest of the shareholder; and it would be singular if, in the use of the term in the connection of State taxation, congress intended a totally different meaning, without any indication of such intent.

" This is an answer to the argument that the *term*, as used here, means only the interest of the shareholder as representing the portion of the capital, if any, invested in the bonds of the government, and that the State assessors must institute an inquiry into the investment of the capital of the bank, and ascertain what portion is invested in these bonds, and make a discrimination in the assessment of the shares. If congress had intended any such discrimination, it would

have been an easy matter to have said so. Certainly, so grave and important a change in the use of this term, if so intended, would not have been left to judicial construction.

"Upon the whole, after the maturest consideration we have been able to give to this case, we are satisfied that the States possess the power to tax the whole of the interest of the shareholder, in the shares held by him in these associations, within the limit prescribed by the act authorizing their organization."

We have quoted thus liberally from the opinion of the Supreme Court of the United States, because it so conclusively and completely disposes of and settles the fundamental principle common to all the cases at bar (except two)—namely, the liability to assessment and taxation of all the shareholders in the capital of the national banks organized under the acts of congress, in respect to the shares owned by them respectively, and without any deduction to be made by reason of any investment by the bank of the whole or any part of its capital in the bonds or securities of the United States. It is our duty, as it is our pleasure, to conform our action to the law as thus expounded by the highest judicial tribunal known in our system of jurisprudence; and we do it none the less cheerfully, because it is in harmony with the opinions heretofore expressed by this court. These views and considerations dispose of the main question common to all the cases, except those marked 6 and 9.

It is appropriate next to consider whether the assessments brought under review have been made in the manner pointed out by the act of congress, and in conformity to the laws of that body, and those of this State.

1. Are the assessments in harmony with the provisions of the act of congress?

The 40th section of the act of congress of June 3, 1864, declares "that the president and cashier of any such association shall cause to be kept, at all times, a full and correct list of the names and residences of all the shareholders in the association, and the number of shares held by each, in the office where its business is transacted; and such list shall be

subject to the inspection of all the shareholders and creditors of the association, and of the officers authorized to assess taxes under State authority, during business hours of each day in which business may be legally transacted; and a copy of such list, on the first Monday of July in each year, verified by the oath of such president or cashier, shall be transmitted to the comptroller of the currency." And section 41st of the same act provides "that nothing in this act shall be construed to prevent all the shares of any of the said associations held by any person or body corporate from being included in the valuation of personal property of such person or corporation in the assessment of taxes imposed by and under State authority, at the place where such bank is located, *and not elsewhere.*" It is not controverted, but that the assessments of these relators have been made in literal compliance with these directions. It is now, however, earnestly urged that the relators could not be legally assessed at the place where the respective banks were located, in which they hold and owned shares, when their own personal residences were at different and other places. This objection will be hereafter considered.

2. The act of congress contains these two additional provisos:

(1.) That the taxation imposed shall not be at a greater rate than upon other moneyed capital in the hands of individual citizens of the State where made; and

(2.) That the tax so imposed under the laws of any State, upon the shares of the association authorized by that act, should not exceed the rate imposed upon the shares of any of the banks, organized under the authority of the State where such association is located.

As to the first proviso, it is now insisted, that, as the stocks and securities of the United States held by individuals are exempted from taxation, it necessarily follows that the relators, being assessed for the value of their shares in the capital of an association invested wholly or in part in these securities, are assessed, and will be compelled to pay, a tax at a greater rate than will be paid by other moneyed capital in

the hands of individual citizens of this State. The unsoundness of this argument may be tested by a few considerations.

Congress was well aware that the stocks of the United States, owned and held by individuals or by corporations, could not be taxed by State authority. It certainly could not be successfully maintained, that, if the owners of such stocks should elect to employ them in a system of banking created by congress, it was not competent for that body to make it a condition of such use, that the same should be taxable by State authority, at the place where the business of banking was transacted, and that such property should thus equally contribute to the burdens imposed upon other property of the community, from which the profits of its employment were derived. Such property would enjoy the protection of the laws and institutions of the place where thus employed in the business of banking. Such use must be deemed profitable and advantageous at that locality; if not, it would seek other places. It is but justice, therefore, that it should contribute to the support of the government which protects it. Congress clearly intended that the person who should derive a distinct profit from a new and special use of the securities of the United States, should not escape his just and appropriate contributions from such distinct extra profit to govermental support.

This court said, in the case of *The City of Utica* v. *Churchill* (*ubi supra*), that this action of congress " is, in substance, a declaration of the supreme legislative authority of the Union; that the bonds may be taxed against shareholders (if taxation of the shares is taxing of the bonds) when they are made parcel of a national bank."

But we think it was clearly demonstrated, in the opinion of the chief judge of this court, in that case, that the assessment and taxation of the shares of a banking association are not a taxation of the property in which the capital of the bank has been invested. It was then said : " The shares of these banks are personal property. The stock is a species of a chose in action, or an equitable interest, which the shareholder possesses, which he can enforce against the

corporation. The shareholder is not the owner of the public stock possessed by the corporation, any more than he is the owner of the discounted notes or other securities held by the bank. He is not the owner of either. He is only entitled to participate in the net profits earned by the bank, and, upon its dissolution, to have his proportion of, what may remain after payment of its debts." If these views are sound, and we cannot doubt that they are, and we believe them to have been approved by the Supreme Court of the United States, then, there is no force in the objection now under consideration. It cannot be .successfully maintained, that a greater rate is assessed upon the shareholders of these associations, than is assessed upon other moneyed capital, in the hands of individual citizens of this State, from the fact that stocks or bonds of the United States, held and owned by the latter, are not subject to taxation.

The obvious intent and meaning of this proviso are, that the *rate* or percentage of taxation should be the same on the personal property of these shareholders as that imposed on the personal estate of individual citizens of the State. It is proper here to observe, that we have not before us the rate of taxation which the appropriate taxing power has or may impose upon the assessments which have been made. We have only brought under review the elements going to make up the aggregate amount of these assessments. We are bound to assume that the same rate or percentage will be imposed on all assessments for personal property, and that no invidious discriminations will be made to the prejudice of the shareholders of the national banks. " *Omnia præsumuntur rite et solemniter esse acta, donec probetur in contrarium.*"

The only question now under review is, the liability of these relators to be assessed in respect of their ownership of shares in these national banks. It is apparent that congress, by this proviso, intended to secure the same rate of taxation upon the owners of these shares, as the State authorities lay upon the individual citizens of the State. Congress did not fail to see that an authority to tax the owners of the shares of these banks at the place where, in each

instance, the bank was located, and not elsewhere, would include a power to impose such tax, in part, if not wholly, on citizens of other States. Such occasion would afford an opportunity of making unjust discriminations, adverse to the non-resident, and showing favoritism to the citizens of the State imposing the tax. It is not unreasonable to suppose that all the shares in a bank, located in the city of New York, or in the city of Chicago, might be wholly owned by citizens of other States than that in which it was situated. Congress intended to prevent any injustice, by declaring that non-resident citizens should not be subject to a greater rate of taxation than that imposed on resident citizens ; in other words, that the rate of taxation should be uniform, without reference to the kind of property assessed, or whether owned by the citizens of the State or non-residents thereof. The rate or percentage of taxation upon the assessments is, in all cases, to be the same.

3. The second proviso declares that the tax imposed under the laws of any State, upon the shares of the associations authorized by that act, shall not exceed the rate imposed upon the shares of any of the banks, organized under the authority of the State where such association is located. At the time when the assessments were made, which passed under the review of this court, and of the Supreme Court of the United States, in Churchill's case, the banks organized under the authority of this State were taxed upon their capital. The corporations themselves, and not the shareholders, were taxed and assessed, and the assessment was upon the amount of their capital stock. If the whole or any portion of such capital was invested in the stocks or securities of the United States, then the same was necessarily deducted from the amount of such capital, and the assessment confined to the residue. Such a mode of taxation, in respect to the banks authorized under the laws of this State, the Supreme Court of the United States held, precluded the taxation under the authority of this State of the shareholders in the national banks, as such taxation was in conflict with the second proviso of the 41st section of the act of congress. We have seen

that, for this reason, the assessment and taxation made and levied under the law of March 9, 1865, were held to be illegal and void by the Supreme Court of the United States. This difficulty, which existed as to the validity of the assessments made under the act of 1865, has now been removed by the act of April 23, 1866, already quoted. By the terms of the latter act, after its passage, no tax can be assessed upon the capital of any bank or banking association organized under the authority of this State; and said act also declares that the stockholders in said banks, whether national or State, shall thereafter be assessed and taxed on the value of their shares of stock therein. The act has, therefore, adopted a uniform system for the taxation of the shareholders in the banks of this State, and of the national banks located therein, in conformity to the decision of the Supreme Court of the United States, without which uniformity, that court had decided this State could not lawfully subject to taxation the shareholders in the national banks located therein.

It is not claimed that such uniformity has not now been attained, or that the practice under the act of 1866 has not been in conformity to its provisions. No greater tax has been or can now be imposed, under the laws of this State, upon the shares of the national banks located in this State, than is imposed upon the shares of the banks organized under the laws of this State. The assessments under review also conform to the directions of the act of congress in this, that the shares held by the relators in the several banks in the record mentioned, whether State or national, have been included in the valuation of the personal property of such person, in the assessments for taxes made under State authority, at the place where such banks are located, *and not elsewhere.* A careful examination of the various provisions of the act of congress will show that they have all been complied with, in making the assessments upon the several relators in these actions.

It will now be convenient to proceed in the examination of the provisions of the various statutes of this State relative to these assessments. The act of April 23, 1866, follows the act of congress in declaring that the shares of stock in

TIFFANY — VOL. VIII.     55

the national banks, shall be included in the valuation of the personal property of such stockholder in the assessment of taxes at the place, town, or ward where such banking association is located, and not elsewhere. As the real estate of the banks located in the State was subject to State taxation, it was peculiarly just and proper that such portion of the capital stock thereof, as was invested therein, should be proportionally deducted from the valuation of the shares of the respective shareholders. It is conceded that this has been done.

It is also urged, in behalf of the relators, that said assessments are not conformable to the act of congress and the said act of the legislature of this State passed April 23, 1866, inasmuch as both of said acts declare that said shares shall not be assessed and taxed at a greater rate than is assessed upon other moneyed capital in the hands of individuals in this State; and that in making these assessments the respondents have disregarded this injunction. Some observations have already been made upon this clause in these acts, but it is now to be considered in another aspect.

It appears from the record that the respondents, in making assessments of insurance companies located in the city of New York, and which by the laws of this State are to be assessed upon their capital, have deducted from such assessments, respectively, the amount of capital invested by said insurance companies in the stocks or bonds of the United States, as by law they were bound to do. They were equally bound to make the same deductions in assessing the personal property of an individual. That such deductions or allowances were required by law to be made, must have been well known to the framers and makers of this act of congress at the time of its passage.

It is now urged that because such stocks or bonds could not be taxed when held by an individual or an insurance company taxable on its capital, and for the reason that in assessing individuals and insurance companies such deductions have been made as the law required, it follows that a greater rate has been assessed upon the shareholders of these

banks than upon moneyed capital in the hands of individuals. This argument has, in part, already been answered; and it is very plain that this view of this clause is an entire misapprehension of the meaning and intent of congress. If sound, it follows that no taxation whatever could ever be imposed upon these shareholders. This argument overlooks the fact that the persons or corporations to whom this exemption is accorded are the owners of the stock or securities exempted, while these shareholders are not the owners of the bonds or securities in respect of which they claim a like exemption. It is, also, to be observed, that the act of congress makes no mention of insurance companies in either of the provisos of the act. The first refers only to capital in the hands of individual citizens — an inapt expression to indicate the ownership of capital by an insurance company; and the second, to *banks* organized under the laws of the State. By no sound canon of interpretation can individual citizens or banks be construed as meaning or including insurance companies.

We are of the opinion, therefore, that the objections of the relators to these assessments derive no support from the fact, that the respondents, in making assessments for taxes, have deducted from the valuation of the personal property of individual citizens, the amount of stocks or bonds of the United States held and owned by them, or that they have deducted from the capital of insurance companies such portion thereof as was invested in the same stocks or bonds. It is very clear that congress did not intend that the owners of shares in these banks should be exempt from taxation, for the reason that the owners and holders of the stocks and bonds of the United States were exempt to the extent of the amount so invested. Knowing full well that such exemption existed and would be availed of, congress, nevertheless, declared that the shareholders in the banks which it authorized or created should be taxed on the valuation of their shares.

It will be appropriate next to inquire whether the action of the respondents, in making these assessments, has conformed to the other provisions of the laws of the State of

New York regulating the assessments for taxes. A correct understanding of the points urged by the relators, renders necessary a brief review of the provisions of the laws of this State relating to the assessments for taxes in the city and county of New York.

These are found in the act of April 14, 1859. (Laws of 1859, ch. 302.) This act provides for the appointment of three commissioners, who are to form a board to be known as commissioners of taxes and assessments for the city and county of New York. Such board was authorized to appoint, not exceeding twelve persons, to be known as deputy tax commissioners, who should perform, under their direction and supervision, the duties theretofore performed by the assessors of the several wards of said city, or such other duties as said commissioners should prescribe. It was made the duty of such deputy tax commissioners, under the direction of said commissioners, to assess all the taxable property in the several districts that might be assigned to them in said city. Such deputies were to commence to assess real and personal estate on the first Monday of September in each year. The said commissioners were to keep books, to be called, "The Assessed Record of Real and Personal Estate," in which should be entered in detail the assessed valuation of such property, and which books were to be open for examination from the second Monday of January until the first day of May in each year. The commissioners are required to cause to be prepared from the said books, on the first day of May in each year, the assessment rolls of said city, and to certify that the same are correct. The rolls so certified must, on the first Monday of July in each year, be delivered to the supervisors of said city and county, who are to meet on that day for the purpose of receiving the same, and to lay and impose the tax thereon, authorized and required by law to be levied and raised upon the real and personal estate located within said city and county, and which had been assessed therein. On the 20th of April, 1866 (Laws of 1866, ch. 698), the legislature of this State passed an act in the words following: "The commissioners of taxes and assessments for the

city and county of New York are hereby vested with full power and authority to make therein the assessments authorized by any law of this State; and for such purpose, the time for completing the assessment rolls for the current year shall be extended to 30th of June, 1866." That act took effect immediately on its passage.

It will be seen that this act conferred the same power upon the tax commissioners to make assessments as had theretofore been conferred on and been exercised by the deputy tax commissioners. Their powers in this respect were, by this act, made concurrent, and the time for completing the assessment rolls for the current year was extended to June 30th. It is conceded that the respondents assessed the several relators within the time so extended and limited; and we are clearly of the opinion that they were amply authorized so to do. These actions were heard and decided upon the facts appearing in the return of the respondents; and these facts must be taken as conceded by the relators, as no issue was made upon the return. It was undoubtedly framed so as to present all the material questions arising in these controversies and needful for the consideration of the court. The respondents were, therefore, authorized to make these assessments in the manner and at the time they did.

We have now discussed all the questions presented for consideration, common to all the assessments brought up for review. There remains to be considered several points which are peculiar to certain of the cases.

*First.* In the third and fourth of the above-entitled actions, the relators claim that their shares of stock are exempt from taxation in national banks located and doing business in the city and State of New York, on the ground that they are non-residents of the State of New York; and the relator in the second above-entitled action claims a like exemption, on the ground that he is a resident of the county of Kings, and not a resident of the city and county of New York. And in the fifth above-entitled action the relator claims exemption on the ground that, at the time of such assessments, he was a resident of the county of Queens, and not a

resident of the city and county of New York. It will be convenient to consider these claims together; for it is not perceived, in the views we take of them, that there is any substantial difference between them. It is to be remembered that the act of congress authorizes the taxation of these shares at the place where the bank is located, *and not elsewhere.* It is thus seen that there is no force in the position that the relators may be taxed for the same identical property at the places of their respective residences. This cannot lawfully be done, as the act of congress is emphatic that the shareholders shall not be taxed elsewhere than at the place of the location of the bank in which the same is owned. It is very manifest that it was the intention of congress to subject such shares to taxation at that locality, and not elsewhere, without any reference, or attaching any importance, to the consideration where the stockholder or the shareholder resided. We have seen that, by the 40th section of the act, it was made the duty of the president and cashier of every such bank to keep at all times a full and correct list of the names and residences of all the shareholders, and the number of shares held by each, in the office where its business is transacted, and that such list should be subject to the inspection of the officers authorized to assess taxes under State authority, during business hours of each day; and the act authorizes the assessment of all the shares in said association at the place, &c. These provisions are significant and conclusive, to show that it was plainly the intention of congress to subject all the shares to taxation only at the place of the location of the bank; and the act thus provided for the making and keeping the list of shareholders at the bank, for the use and inspection of the taxing officers, for the sole purpose of enabling them to assess all the shares at one locality. It was a convenient and certain method of insuring the taxation of all the shares, by thus assessing and taxing them at the locality where the business of the bank was transacted, and where the money invested in its shares made its profits. It was also just. Congress certainly did not intend that if the shares of a bank, located in the city of

New York, were all owned by residents of Kings county, or by residents of the State of New Jersey or Connecticut, that the owners of such shares should be exempted from the burdens imposed upon the shares of stock in a bank which was owned wholly by residents of the city of New York. The construction contended for would give perfect immunity from taxation to all shares owned by persons not residents of the same locality as that of the bank; for the act of congress declares that such shares shall not be taxed elsewhere than at such location. The like result would follow where a part of the shares was owned by non-residents, and a portion by residents. Upon this construction, the former would be exempt, and those of the latter not only have to bear their appropriate share of taxation, but an increased amount by reason of such exemption. It would also follow, that, if all the shareholders resided in different localities from that of the bank, all the shares of such bank would escape taxation. A reading of the statute, which would produce such incongruous and unjust results, cannot be sound. It has for years been the practice in this State to tax the personal property of non-residents which had a *situs* within this State. An act was passed in 1855 (Laws of 1855, chap. 37) which enacts that all persons or associations doing business in the State of New York as merchants, bankers or otherwise, either as principals or partners, whether special or otherwise, and not residents of this State, shall be assessed and taxed on all sums invested in any manner in said business, the same as if they were residents of this State; and said taxes shall be collected from the property or firms, persons or associations, to which they severally belong. The provisions of this act have been examined and passed upon by this court; and the principle of taxing the property of non-residents used and employed in business here, and declared in the act of congress and in the statute of April 23, 1866, as to the owners of shares in banks, is not unfamiliar to our system of taxation, and has been recognized and sanctioned by this court. In the case of *The People* v. *Commissioners of Taxes* (23 N. Y., 224), it was held that, under the laws of this State. the

personal property of a non-resident of this State having a *situs* in this State was, by the laws thereof, subject to taxation within this State. The same doctrine was affirmed in the case of *The Parker Mills* v. *Commissioners of Taxes* (id., 242). In the former case, the decisions bearing on this point were carefully discussed and reviewed; and it was shown that the highest court in five States of the Union had affirmed the same principle. The case of *Catlin* v. *Hull* (21 Verm., 152) was cited, commented upon, and approved.

Among the propositions argued on behalf of the plaintiff in that case, it was urged that personal estate, having no fixed *situs*, followed the person, and that the property subjected to taxation in that case could not legally be taxed, because the owner was domiciled out of the State. This argument was carefully considered and rejected by the Supreme Court of Vermont. After referring to and recognizing the fiction insisted on, that personal property followed the person, it was observed by the court: "But this rule is merely a legal fiction, adopted from considerations of general convenience and policy, for the benefit of commerce, and to enable owners to dispose of property at their decease agreeably to their wishes, without being embarrassed by their want of knowledge in relation to the laws of the country where the same is situated. But this doctrine," it was added, "in relation to the *situs* of personal chattels and their transfer and distribution, we do not consider at all conflicting with the actual jurisdiction of the State where it is situated over it, or with the right to subject it, in common with the other property of the State, to share in the burden of government by taxation." And it was also observed: "We are not only satisfied that this method of taxation is well-founded in principle and upon authority, but we think it entirely just and equitable that, if persons residing abroad bring their property and invest it in this State, for the purpose of deriving a profit from its use and employment here, and thus avail themselves of the benefits and advantages of our laws for the protection of their property, their property should yield its due proportion toward the support of the government which protects it."

And it was pertinently and truly said, by Chief Justice LOWRIE, in the case of *Finley* v. *The City of Philadelphia* (32 Penn., 381), that " there is nothing poetical about tax laws. Wherever they find property they claim a contribution for its protection, without any special respect to the owner or his occupation." This principle of taxation was distinctly affirmed in the Circuit Court of the United States for the southern district of New York, in 1859, in the case of *Duer* v. *Small*. The complainant was a resident and a citizen of New Jersey, and sought an injunction against the receiver of taxes in New York to restrain him from collecting taxes or levying upon goods and chattels to satisfy the same. The complainant was engaged in the business of banking in the city of New York, and was taxed upon personal property invested in such business. He contended that the law of this State, subjecting his property to taxation, was unconstitutional and otherwise illegal. The bill was dismissed. It was held that the owner of property within the limits of a State, whether it be real or personal, and no matter where the owner had his domicil, has a right to call upon the government of the State to protect such property by its laws, and its officers acting under such laws. But such protection cannot be afforded. unless means, by the way of taxes, are furnished to afford the protection. And taxes are no more to be levied upon the property of the resident to protect the property of the non-resident, than taxes are to be levied upon the property of a non-resident to protect the property of a resident; that all property enjoying protection must equally share the burden which that protection imposes and demands.

The precise point now under consideration was passed upon by this court in the case of *The City of Utica* v. *Churchill* (*ubi supra*). It there appeared that only one of the plaintiffs and owners assessed resided in the ward in the city of Utica in which the bank was situated. Of the other parties taxed, one resided in another ward in the city, one in the same county, another in another county of the State, and the remaining one in the District of Columbia. This court held that all the persons named were legally taxed under the act

of congress and the laws of this State, at the place of the
location of the bank in which they owned shares, and that
the effect of the proviso in the act of congress was to permit
the States so to shape their laws of taxation as to tax all the
shareholders at one locality; that is, at the place where
the bank is situated and doing business, as had been done in
that case under the enabling act of 1865. We understand our
views on this point to have received the approval of the
Supreme Court of the United States, in the opinion delivered
in the Churchill case. The judgment in that case could not
have been affirmed by that court without such approval; and
it is distinctly stated in the opinion that the judgment would
have been affirmed but for the reasons stated in the forepart
of that opinion, and which have been already adverted to.
A more extended consideration has been given to this point
than at first blush it would seem to be entitled to receive, in
view of what has been decided by this court, and by the
Supreme Court of the United States. But the argument is
again pressed upon us with energy and ability, that this
State has not the power to tax the property of non-residents,
and that the exercise of that power will inevitably subject the
owner of such property to double taxation. The grave
importance of this question to the several States of this
Union must be the apology, if any be demanded, for the
space occupied in discussing this point. It is believed that
it has been shown that taxation at the locality of the bank
was the prominent idea of the framers of the act of congress,
and the language of the act not only permits, but directly
authorizes, such taxation there, and not elsewhere. As the
sole means to prevent the evil and wrong of double taxation,
it is earnestly urged upon this court that it should hold that
all property can only be taxed at the residence of the owner.
A conclusive answer to this argument is, that the act of con-
gress emphatically declares that such shareholders shall be
taxed at the locality of the bank, and *not elsewhere*. These
shareholders, by the act of taking stock in these banks, have
accepted the terms and conditions named in the act. They
cannot now be heard to allege that such terms are onerous,

and may be tortured into mischief and wrong to them. They cannot now be permitted to say, " *Non in haec fœdere veni.*" We, therefore, think that the position of these relators in the four cases above referred to — that they are only liable to taxation, in respect to their shares, at the places of their respective residences — cannot be maintained or recognized.

In the actions numbered 6 and 10, the relators claim, in their points, that the assessments made upon them, in respect to their shares of stock mentioned in the record, were made after the books were closed and without notice to them. A reference to the return of the respondents will show that this is an error. From that return it appears, that such assessments were made between the 2d day of May, 1866, and June 1st, 1866, being within the period, as we have seen, the respondents were authorized to make assessments. And the respondents further state that, after such assessments had been made, they caused notice thereof to be given to the said relators, that said assessments might be inspected, revised, and corrected at any time before the 30th of June, 1866. The respondents further return that, during the said month of June, conformably to said notice, the relators objected to the assessments so imposed, stating the grounds of their objections, and requested the respondents to erase said assessments, or to correct, alter, or modify the same, which the respondents, after said hearing, refused to do. It appears from the record that all the relators had notice of their respective assessments, were heard before the respondents in relation thereto ; that their objections were received, considered, and decided upon. We think these facts show that all the relators had full notice of their respective assessments, as far as we can suppose to be required by any law ; that their objections thereto were considered and passed upon, and that in this regard they have no cause of complaint. Being clearly of the opinion that the respondents had ample authority, under the act of April 23, 1866, after the first day of May in that year, to add to the assessment-rolls the names of persons liable to assessments who had been theretofore omitted, or to add to the assessments of those whose names were then upon

the rolls, such amounts as in their judgment should be assessed upon those persons respectively, it was clearly their duty to make such additions, if the necessity therefor arose. The law requires notice to be given to every person affected by any such alteration or addition ; and the returns show that in every instance such notice was given. There would, therefore, seem to be no just ground for complaint on the part of the relators, that they had not had the fullest opportunity of being heard before the respondents in opposition to the assessments imposed upon them.

The relators in actions numbered 6 and 9, David Dows and Ralph Mead, insist that they are not taxable in respect to their ownership of shares in the capital stock of the Corn Exchange Bank — a bank organized and created by and under the laws of the State of New York, and the capital of which bank consisted wholly of stocks, bonds, and securities issued by the United States, and which are exempt from taxation by or under State authority. The right to tax these shares is derived exclusively from the act of the legislature of New York passed April 23, 1866 ; and the duty of the State so to tax them, if they would tax shares in the national banks, is enjoined by the act of congress, as it is construed by the Supreme Court of the United States. While it is conceded that the owner of these securities cannot be taxed upon them, it is believed that it does not follow that the owner of shares in a bank or other incorporation, who is taxed on the value of such shares, is exempted for the reason that the capital of such bank or corporation is invested in exempt stocks or bonds. The liability of a stockholder to taxation, when the corporation itself might be exempt, was elaborately discussed by the chief judge of this court in the case of *The City of Utica* v. *Churchill (ubi supra)* ; and in the views expressed by him, all the judges concurred. It certainly would not be profitable to repeat those arguments, or attempt to add to their strength. The reasoning there employed is as applicable to banks organized under the State laws, as it was to those called into existence through the instrumentality of the act of congress ; and it is not perceived

that any reason exists or can be suggested why, if the share-holders in the latter class of banks are not exempted from taxation, on the ground that the capital of the bank issuing such shares is invested in non-taxable securities, the share-holders in the former class of banks should be exempted for the like reason. It would be difficult to see how the Supreme Court of the United States arrived at the conclusion it did — that the disparity in taxing the interests of shareholders in the national and State banks might readily be removed by State legislation — except on the hypothesis that the share-holders in the latter class could be subjected to taxation as well as those of the former. This, of course, could not be done, if, from the circumstance that the capital of the State bank was invested in non-taxable securities, the shares in such State bank were exempted. We have seen that the shareholders in the national banks are not exempted for that reason; and the State legislature having declared the share-holders in State banks subject to taxation in the same manner as those in the national banks, an exemption, not available to one class, cannot obtain in favor of the other.

We were of the opinion, in the case of Churchill, that the banks were the owners of the bonds exempt from taxation, and that the shareholders had a collateral interest respecting them, on account of their title to share in the profits; and that it was the banking corporation, and not the shareholders, which was entitled to claim the exemption from taxation. Such are our views now; and we are, consequently, of the opinion that the relators, Dows and Mead, are not entitled to claim an exemption which could only be availed of by the Corn Exchange Bank itself, if it had been assessed.

We have devoted much space to the examination, perhaps with unnecessary detail, and with some necessary repetition of the various objections taken by the several relators to these assessments. The great importance of the question argued, not only to the people of this State, but equally to those of the other thirty-five States of this Union, appeared to demand this elaborate discussion. If the large amount of property invested in national and State banks is to be

withdrawn from its just and proportionate contribution to the support of the State and municipal governments where it is located and employed, it cannot fail to be seen that the taxation upon other species of property will be most onerous. The large amount of property thus invested will enjoy an immunity and privilege not foreseen or intended by the legislative bodies, which accorded to it the means and opportunity of most profitable employment. If the effort to show that it has been, and ought to be, subject to taxation, alike with other property employed in trade, shall have been successful, and that the respondents, in imposing these assessments, have strictly conformed to the laws, and that no injustice has been done to these relators, other than subjecting their property to the same burdens as are imposed on all other citizens (if it be not a misnomer to call that an injustice), then the time occupied in the discussion will not have been wasted. Regarding, as we have done, that the main question of the relators' liability had been decided adversely to them, by the high tribunal which must ultimately pass upon these cases, it appeared to be only necessary to examine whether any injustice had been done the relators, or any irregularity committed in making the assessments.

A brief recurrence to principles well-settled by repeated adjudications, will show that these relators have no just cause of complaint, that the peculiar species of property owned by them has been subjected to taxation by the authorities of this State. Chief Justice MARSHALL, in the case of *The Providence Bank* v. *Billings* (4 Peters, 561), observed: " That the taxing power is of vital importance, that it is essential to the existence of government, are truths which it cannot be necessary to reaffirm. They are acknowledged and assented to by all. It would seem that the relinquishment of such a power is never to be presumed. No one can combat the correctness of these axioms."

Again, it was said by Mr. Justice WAYNE, in *Dobbins* v. *The Commissioners of Erie County* (16 Peters, 435): " Taxes are never assessed upon persons as persons, but upon them on account of their goods, and the profits made upon professions,

trades and occupations.   They are so imposed, because public revenue can only be supplied by assessments upon the goods of individuals, comprehending, under the word 'goods,' all the estate and effects which any one hath, of whatever sort they be.   Taxes regard the persons of men only because of their goods.   The goods, then, are taxed, and not the persons. But those who are to pay the tax are taxable persons, because they are under an obligation to contribute their means to the necessities of the State.   The obligation, however, only becomes a charge upon the person in consequence of the power in the State to enforce the payment of taxes by coercion. This power extends to the sequestration of the goods and the imprisonment of the delinquent.   A tax, according to the object upon which it is laid, may be a personal charge; but that is a very different thing from its becoming a charge upon the person, in consequence of the coercion which may be provided by law to enforce the payment.   Taxation is a sacred right, essential to the existence of government."

The following positions have been established by repeated adjudications:  That taxation "is an incident of sovereignty, and is coextensive with that of which it is an incident."   "It is called a sacred right."   "It is so ample that it may be exercised on the object to which it is applicable to the utmost extent to which the government may choose to carry it." "There is no limit on the exercise of the right, no guards against the abuse of the power, but in the structure of the government and the discretion of the representatives of the people."   "It is not confined to the people and property of the State:  it may be exercised upon every object brought within its jurisdiction."   "The power of legislation, and, consequently, of taxation, operates on all persons and property belonging to the body politic."   "It is an original principle, which has its foundation in society itself.   It is granted by all, for the benefit of all."   "However absolute the right of an individual may be, it is still in the nature of that right that it must bear a portion of the public burdens, and that portion must be determined by the legislature."  (*McCulloch* v. *The State of Maryland*, 4 Wheat., 428; *Providence*

*Bank* v. *Billings*, 4 Peters, 563; *Biddle* v. *Commonwealth*, 13 Serg. & Rawle, 409; *Brown* v. *State of Maryland*, 12 Wheat., 419.)

In view of these well-settled principles, we cannot hold that the property of these relators has been either unjustly or unlawfully subjected to taxation.

From the most careful examination and consideration which we could give to all the points suggested, we have been unable to discover any error in the judgments appealed from; and we are, therefore, unhesitatingly of the opinion that the proceedings of the respondents have been, in all respects, legal and regular, and that the judgments of the Supreme Court confirming them should be affirmed.

All the judges concurring,

Judgments affirmed.

[NOTE.— The judgments in these cases were affirmed by the Supreme Court of the United States, on the 7th of January, 1867—the opinion of the court being delivered by NELSON, J., and was concurred in by Justices GRIER, CLIFFORD, MILLER, DAVIS and FIELD — CHASE, Ch. J., and Justices WAYNE and SWAYNE, dissenting.    REPORTER.]